IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

PBM PRODUCTS, LLC

                          Plaintiff,

   v.

MEAD JOHNSON NUTRITION COMPANY
and MEAD JOHNSON & COMPANY,

                          Defendants.

Action No. 3:09–CV–269

## MEMORANDUM OPINION

THIS MATTER is before the Court on several evidentiary motions filed by the parties to this dispute. Plaintiff PBM Products, LLC has filed Motions in Limine to exclude the "expert" testimony of Dr. Ravi Dhar (Docket No. 98) and Dr. Richard Gering (Docket No. 97) and an email written by PBM executive Jim McGrath (Docket No. 125). PBM has also filed a Motion to Exclude Witnesses and to Quash Trial Subpoenas (Docket No. 154), which seeks to prevent Mead Johnson from introducing certain witnesses at trial. Likewise, Defendant Mead Johnson has filed Motions in Limine to exclude the "expert" testimony of Dr. Barbara J. Petersen (Docket No. 116), Dr. Kenneth Wise (Docket No. 117), Dr. Douglas E. Schoen (Docket No. 118), and Joseph Ridgway (Docket No. 119). For the reasons stated below, the Court DENIES the Motions in Limine as to Dr. Dhar, Dr. Petersen, Dr. Wise, Dr. Schoen, and Mr. Ridgway. The Court GRANTS in part and DENIES in part the Motion to Exclude Witnesses and to Quash Trial Subpoenas and the Motion in Limine as to Dr. Gering. Lastly, the Court GRANTS PBM's Motion to Exclude Evidence.

## I.  BACKGROUND

The parties to this controversy produce infant formula and compete for shares of that market.  Plaintiff, PBM Products, LLC produces store brand infant formulas, while Defendant, Mead Johnson & Co. produces Enfamil infant formula.

Based on an advertisement distributed by Mead Johnson, PBM has brought a Lanham Act false advertising claim and a commercial disparagement claim against Mead Johnson.   In response, Mead Johnson filed amended counterclaims, alleging breach of contract, defamation, Lanham Act violations, and civil contempt.  In their effort to prove these claims, both parties have filed expert reports and propose producing expert testimony at trial.  As a result, each party has filed the Motions in Limine and other evidentiary motions now before the Court.

## II.  LEGAL STANDARD

"Preliminary questions concerning the qualification of a person to be a witness . . . or the admissibility of evidence shall be determined by the court."  Fed. R. Evid. 104(a).  Rule 702 allows for opinion testimony by an expert.  According to the Rule,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.[1]  "When a party seeks to admit any expert testimony, the district court's obligation is 'gate-keeping.'"  Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 261 (4th Cir. 2005) (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999)).  That is, because "expert witnesses have the potential to 'be both powerful and quite misleading,'" the Court must "ensure that any and all scientific testimony . . . is not only relevant, but reliable."  Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001) (citing Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999) and Daubert, 509 U.S. at 588, 595); see also Richmond Med. Ctr. for Women v. Herring, 527 F.3d 128, 134 n.1 ("Under Federal Rule of Evidence Rule 702 expert testimony must be both relevant and reliable.").

Several factors assist in guiding a trial court's assessment of whether the reasoning or methodology underlying testimony is scientifically valid and "whether that reasoning or methodology properly can be applied to the facts in issue."  Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001) (quoting Daubert, 509 U.S. at 592-93).  These factors include: "(1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its operation; and (4) whether the theory or technique enjoys great general acceptance within a relevant scientific community."  Id. (citing Daubert, 509 U.S. at 592-94).

The party seeking to admit expert testimony must demonstrate relevance and reliability by a preponderance of the evidence.  See Cooper, 259 F.3d at 199 (citing Daubert,

---

[1] Of course, an individual qualified as an expert may base his or her opinion on "facts or data . . . perceived by or made known to the expert at or before the hearing."  Fed. R. Evid. 703.

509 U.S. at 592 n.10). The relevance predicate requires that the scientific testimony must properly 'fit' the facts of the case, meaning that the trial judge must decide "'whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" United States v. Lester, 254 F. Supp. 2d 602, 606 (E.D. Va. 2003) (quoting United States v. Downing, 753 F 2.d 1224, 1242 (3d Cir. 1985)). The court's decision on the admissibility of expert testimony will be reviewed for an abuse of discretion. Anderson, 406 F.3d at 261; see also Forrest v. Transit Mgmt. of Charlotte, Inc., 245 Fed. App'x 255, 2007 WL 2348698, at *1 (4th Cir. Aug. 15, 2007) (citing Malone v. Microdyne Corp., 26 F.3d 471, 480 (4th Cir. 1994)).

## III. PBM'S EVIDENTIARY MOTIONS

### A. Motion to Exclude the Expert Report and Testimony of Dr. Dhar

Mead Johnson has offered Dr. Ravi Dhar to testify as an expert on consumer surveys, and PBM has moved to exclude his testimony. Mead Johnson's counterclaims allege that the product packaging for PBM's formulas contain false statements in violation of the Lanham Act. Mead Johnson relies on two surveys conducted by Dr. Dhar, the "Walmart Survey" (Survey A) and the "Target Survey" (Survey U) to show that PBM's product packaging contains implied false claims. The Walmart Survey assesses consumer takeaway from the label on PBM-produced Walmart Parents' Choice Infant Formula with Added Rice Starch. It purportedly shows that subjects took away the implied messages that (1) PBM's Infant Formula with Added Rice Starch is the "same" as Enfamil E.R. LIPIL, or offers the same ingredients or benefits, and (2) the PBM product had been tested against Enfamil A.R. LIPIL.

The Target Survey assesses consumer takeaway with respect to the label on PBM-produced Target Up & Up Infant Formula with Iron, a "Gentle" formula. This survey purportedly demonstrates that subjects took away the implied messages that (1) the PBM Gentle Infant Formula with Iron is the "same" as Enfamil Gentlease LIPIL, or offers the same ingredients and benefits, (2) the PBM product had been tested against Enfamil Gentlease LIPIL, (3) all or most of the protein in the PBM product is partially broken down, and (4) the PBM product contains as much or more partially broken down protein as Enfamil Gentlease LIPIL. PBM argues that under <u>Daubert</u> and Federal Rule of Evidence 702, Dhar's surveys fail to meet the threshold for expert evidence, do not fit the issues of the case, and whatever probative value they might have is far outweighed by their potential to prejudice the fact finder.

### 1. Dr. Dhar's Filters

First, PBM argues that Dr. Dhar's surveys do not pass the <u>Daubert</u> reliability test. PBM asserts that a well-designed Lanham Act consumer confusion survey firsts asks 'communication' questions to see what messages the viewer got and to 'filter' or separate those viewers who received certain messages from those respondents who did not. PBM claims that Dr. Dhar's survey relied on leading questions without proper filters. It claims that Dr. Dhar's method of filtering was not valid, and led the respondents to Dr. Dhar's desired answers. PBM states that proper filters would have asked a filter question to determine whether respondents perceived any message at all related to the products' benefits before asking about a comparison of the products' benefits. Particularly where those questions were closed-ended, PBM argues that only respondents with certain

responses about whether certain phrases communicated anything to them should have answered questions about comparative testing.

PBM's contentions attempt to avoid a different, yet valid, type of filtering technique, known as "quasi-filtering." Using this method, a survey can also avoid the under and overreporting of opinions, Shari Seidman Diamond, Reference Guide on Survey Research: Reference Manual on Scientific Evidence (Federal Judicial Ctr. 2d ed. 2000) ("Diamond") at 250-51, and its validity is well-established. LG Electronics U.S.A., Inc. v. Whirlpool Corp., No. 08c242, 2009 WL 3113246, at *13 (N.D. Ill. Sept. 28, 2009); Proctor & Gamble Pharms, Inc. v. Hoffman-La Roche, Inc., No. 06cv34, 2006 WL 2588002, at *23 (S.D.N.Y. Sept. 6, 2006); Kinetic Concepts, Inc. v. BlueSky Med. Corp, No. 03ca832, 2006 U.S. Dist. LEXIS 60187, at *22-23 (W.D. Tex. Aug. 11, 2006). Thus, the Court rejects this objection.

**2. Dr. Dhar's Control Questions**

PBM also asserts that Dr. Dhar failed to employ adequate controls to screen out those respondents whose responses are based on "noise" –something other than the claim being tested, such as preconceptions, bias, or other factors. They argue that courts have widely recognized the need for consumer surveys to adjust for so-called 'background noise' that contribute to a survey's results. PBM describes the "standard" method for controlling a survey against pre-existing beliefs, which involves respondents being randomly assigned to one of two conditions in an experimental and control group where both answer the same set of questions, but respondents in the experimental condition view an allegedly deceptive commercial, and respondents assigned to the control condition either view a commercial that does not contain the allegedly deceptive material or do not view any commercial.

PBM argues that Dr. Dhar admittedly did not use this control stimulus method and instead used an "internal" control by asking respondents about other products or ingredients that are not referenced anywhere on PBM's packaging. PBM argues that although Dr. Dhar subtracted from the survey's final results the percentage of participants who responded that these un-referenced products had the same ingredients, he should have subtracted out the "more than half" of respondents who answered "Don't know/None of the above," or conducted further investigation. PBM argues that those respondents may too have had a preconception that store brands are the same as branded products. For this reason, it argues that at most, his "control" may have been able to identify only "yea-sayers" (e.g., those who are not paying attention and answering everything) among his respondents, and this has been held in at least one instance to be insufficient to credit an expert report of a survey since there was no control for determining pre-existing beliefs based on the survey's methodological flaws. See Pharmacia Corp. v. GlazxosmithKline Consumer Healthcare L.P., 292 F. Supp. 2d 594, 601 (D.N.J. 2003).

Finally, PBM argues that even if Dr. Dhar's internal controls were effective to screen out respondents with pre-dispositions, he admitted that he did not employ a separate control in Questions 5, 7, and 8 in both surveys and Question 13 in the Target survey. PBM argues that the conclusions Dr. Dhar would draw from these questions are unreliable and should be excluded.

Despite these alleged weaknesses in Dr. Dhar's controls, the Court finds that Dr. Dhar did provide a control, it was just not the one PBM states it would have used. Another control methodology is to use a control question in the survey itself. Diamond at 260; see

Castrol, Inc. v. Pennzoil Quaker State Co., Civ. A. 00-2511, 2000 WL 1556019, at *19 (D.N.J. Oct. 12, 2000).  Using that approach, Dr. Dhar asked participants what they believed the labels communicated about products or ingredients not mentioned in either of the tested phrases.  Those respondents who said they believed the formulas were the "same" ingredients or benefits were subtracted from the number responding "same" to the test questions.  Using this method, Dr. Dhar's survey attempted to weed out those participants with preexisting beliefs that all infant formulas are the same or other biases.  Although Dr. Dhar did not have control questions for all survey questions, Dr. Dhar's report and Mead Johnson's arguments on this point demonstrate that Dr. Dhar is not using the responses to those questions alone to prove consumer perception, but merely to reinforce the results of other controlled questions.  PBM's other arguments on this point go to the survey's weight, not its admissibility.

### 3. Issues of Fitness

PBM next argues that Dr. Dhar's conclusion that consumers perceive the "compare to" label on PBM's packaging as communicating that the products have the same ingredients or provide the same benefits is true, and therefore, PBM's "compare to" statements are not false.  PBM notes that similarly, Dr. Dhar concluded that the PBM labels communicate a message that the PBM products were "tested" against their Enfamil counterparts.  Since there is no dispute that there is testing comparing the respective products, PBM draws the conclusion that Dhar must concede that this claim is not false.

PBM also argues that Dr. Dhar's surveys should be excluded as irrelevant because they do not "fit" the issues of the case.  Specifically, PBM asserts that Dr. Dhar's surveys do

not show that PBM is communicating that its formulas are identical to Mead Johnson's, or any false messages, since Dr. Dhar did not ask in the surveys whether the label communicated that the two products were equivalent in performance or whether the products are identical in composition.

The Court rejects PBM's arguments, finding that Dr. Dhar's survey is sufficiently relevant to Mead Johnson's Lanham Act claim to be admissible. Mead Johnson's false advertising counterclaim asserts that PBM's infant formula product labels are falsely communicating that PBM's infant formulas have the same ingredients and benefits as Mead Johnson's infant formulas. To support that argument, Mead Johnson proposes Dr. Dhar's survey to provide evidence on how consumers may respond to specific statements in the context of infant formula products and what beliefs about the product consumers would take away from those claims. The proposed survey fits Mead Johnson's claim and, moreover, may be used to prove their claim on other Mead Johnson formulas. See JTH Tax, Inc. v. H & R Block Eastern Tax Services, 128 F. Supp. 2d 926, 939 (E.D. Va. 2001), vacated on other grounds, 2002 WL 27257, at *6 (4th Cir. Jan. 10, 2002). This argument, as well as others offered by PBM, attack the weight the jury may give to the survey, not the admissibility of it.

**4.  Materiality of Whey Protein Claim**

PBM's last argument focuses on the "Partially Broken Down Whey Protein" claim. Dr. Dhar concluded that the statement communicates the purported false message that all or most of the whey protein in PBM's gentle products is partially broken down, or that PBM has the same amount of partially broken down whey protein as Enfamil Gentlease LIPIL. PBM argues that even if Mead Johnson can prove that the claim communicates an untrue implied

message, it is not "material" because whatever differences exist in the amount of partially broken down whey protein, there is no scientific proof that the products are different as to digestibility.  Therefore, PBM argues that the claim is not actionable under the Lanham Act.

A misrepresentation is material when it is "likely to influence the purchasing decision." <u>Scotts Co. v. United Indus. Corp.</u>, 315 F.3d 264, 272 (4th Cir. 2002) (quoting <u>Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.</u>, 284 F.3d 302, 310-11 (1st Cir. 2002)). One method of establishing materiality involves "showing that the false or misleading statement relates to an 'inherent quality or characteristic of the product.'" <u>Cashmere,</u> 284 F.3d at 311-12.  Here, Mead Johnson argues that the inclusion of partially hydrolyzed protein in PBM and Mead Johnson's partially hydrolyzed infant formula is an "inherent quality" of the product and that the degree of hydrolization in the product is material to doctors and consumers choosing an infant formula for babies with minor digestion problems.  This argument, whether it will carry the day or not, is one for the jury, not the Court, to consider.  Accordingly, PBM's Motion in Limine as to Dr. Dhar is DENIED.

**B.  Motion to Exclude the Expert Report and Testimony of Dr. Richard Gering**

Mead Johnson's counterclaims allege that certain PBM statements breached a settlement agreement with Mead Johnson, violated a sealing order in a prior litigation between the parties, and defamed Mead Johnson, and that the product packaging for PBM's formulas contain false statements in violation of the Lanham Act.  Mead Johnson alleges that it has suffered over $75 million in damages, and relies on Dr. Richard Gering in support of this figure.  PBM asserts that Dr. Gering's report is built on a foundation of arbitrary and

unsupported assumptions lacking factual support and ignoring salient market factors, and therefore should be excluded under Rule 702 of the Federal Rules of Evidence and <u>Daubert</u>.

Dr. Gering broke out his damages analysis into two parts: (i) damages for contempt, defamation, and breach of contract ("CDB damages"), all arising in connection with the Press Release, and (ii) false advertising damages. The Court will evaluate each part below.

<u>1. Dr. Gering's CDB Damages Calculations</u>

PBM argues that based on Fourth Circuit precedent, expert testimony concerning damages "must be based upon the proper factual foundation," <u>see</u> <u>Elcock v. Kmart Corp.</u>, 233 F.3d 734, 754 (3d Cir. 2000), should be excluded when based on assumptions which are speculative and not supported by the record, and must be causally related to the alleged harm. <u>See</u> <u>Tyger Constr. Co. v. Pensacola Constr. Co.</u>, 29 F.3d 137, 142 (4th Cir. 1994). PBM argues that Dr. Gering's calculation of $7.2 million in CDB damages rests on the assumption that the impact of the Press Release is a five percent decrease in the effectiveness of Mead Johnson's Advertising and Promotion expenditures. PBM alleges that the five percent figure used in Dr. Gering's CDB damages is an arbitrary assumption not based on any factual or economic foundation.

In response, Mead Johnson argues that experts can draw reliable conclusions without the use of a "rigid" formula or methodology, utilizing a set of observations based on extensive and specialized experience. It asserts that Dr. Gering has over twenty years of experience in statistical and econometric models and analysis related to commercial disputes as an economist, consultant, and writer/lecturer on econometrics. He has also previously testified as a damages expert in numerous cases such as patent infringement cases with damages

issues "similar in analysis to false advertising under the Lanham Act." (Def.'s Opp'n. to Pl.'s Mot. 3 n.3, Ex.2, Gering Aug. Rep.)

Despite Dr. Gering's academic and practical experience, the Court finds Mead Johnson has not shown that Gering's five percent calculation is the product of a reliable methodology for quantifying damages in this case. Dr. Gering's CDB analysis establishes no causal link between the alleged misconduct and the claimed damages of five percent. Rather, Dr. Gering had to speculate that because of the Press Release, fewer doctors would recommend Enfamil, new consumers would choose other brands, and existing customers would switch to other brands. Under established Fourth Circuit law, abstract, theoretical views of potential harm, such as the CDB damages here, cannot provide the basis of a damage estimate. See Windsor Power House Coal CO. v. District 6 United Mine Workers of America, 530 F.2d 312, 317 (4th Cir. 1976). Therefore, the Court GRANTS PBM's Motion in Limine as to Dr. Gering's CDB damage testimony.

2. Dr. Gering's Lanham Act Damages Calculation

PBM next argues that Dr. Gering's calculations of Mead Johnson's lost profits based on PBM's alleged false advertising rest on incorrect assumptions, ignore relevant factors affecting sales, and do not "fit" the facts of the case. It claims that Lanham Act decisions have developed careful rules preventing speculative damages predicated solely on a finding of liability. PBM also argues that Dr. Gering failed to conduct a causation analysis, and establish actual damages and a causal link between those damages and a Lanham Act violation.

Unlike Dr. Gering's CDB damage calculations, the damage calculations for the Lanaham Act claim are based on a recognized economic approach. Here, Dr. Gering used a market share approach that is sufficiently rooted in existing market conditions and record evidence to be admissible. Of the three PBM "store brand" infant formula products accused of bearing false and misleading "Compare to" claims – Routine, Gentle, and Added Rice – Gering selected the month of January 2006, the earliest year for which PBM produced sales data for each product, as the "baseline" for all three products. Only sales after January 2006 were included in his damages calculation, and he allocated the volume of those sales, on a monthly basis, to each participant in the infant formula market according to its market share, including both Mead Johnson and PBM. Furthermore, the Court rejects PBM's other arguments, which go more to weight than admissibility, and, accordingly, DENIES the Motion as to Dr. Gering's Lanham Act damages.

## C. Motion In Limine to Exclude Email Evidence

Pursuant to Federal Rules of Evidence 401 and 403, PBM and Paul Manning seek to exclude an e-mail authored by one of PBM's executives, Jim McGrath ("McGrath email"). Alternatively, PBM requests that Mead Johnson be prohibited from discussing or displaying the McGrath email until an evidentiary foundation is laid. PBM argues that the email is not relevant to any issues of the case and that even if it were relevant, the probative value in the email is outweighed by the danger of unfair prejudice. In its opposition, Mead Johnson requests that the Court allow the McGrath email to be considered for all purposes prior to trial and allow its admission into evidence at trial because it is relevant, not unfairly prejudicial, and raises issues of credibility that should be determined by a jury.

The relevant language of the McGrath email is as follows:

> Dianna
>
> We have just sued Mead Johnson once again and this time for $600 million. The last two times we sued them, as you might remember, we settled for $40 million and then 6 months later for $6 million. This should help me get thru [sic] my senior years in a little more style. Of course I'll have to wait for the settlement but the plan is to go back to the same federal judge in Richmond and keep the pressure thru the media.
>
> Jim

(Pl.'s Mot. To Exclude, Ex. A.)

In light of the Court's ruling on Dr. Gering's CDB damages and the dismissal of Mead Johnson's contract, defamation, and civil contempt claims, the McGrath email can only be relevant if it can be used to support Mead Johnson's Lanham Act claim. Mead Johnson argues that it is fair and reasonable to draw the inference from the email that PBM anticipated a speedy and significant settlement with Mead Johnson, and Mead Johnson asserts that this undermines the notion that PBM senior executives view Mead Johnson's advertising as having caused any actual harm to PBM. This argument is highly dubious. The author of the email has no responsibilities at PBM related to advertising, marketing, sales, policy or strategy, or legal decision making. (PBM Mot. In Limine, Ex. C, McGrath Profile.) And the email does not actually telegraph any variation of the message that PBM believed that the Mailer did not cause actual harm. To the extent the email continues to reflect any glimmer of relevance, the Court finds that, under Rule 403 of the Federal Rules of Evidence, its probative value is substantially outweighed by the likelihood of unfair prejudice. Accordingly, the Motion to Exclude is GRANTED.

**D. Motion to Exclude Witnesses and to Quash Trial Subpoenas**

PBM has filed a Motion to exclude four witnesses listed by Mead Johnson and to quash subpoenas issued to seven others. PBM claims that Mead Johnson has violated a pre-trial agreement governing discovery disclosures on which PBM had relied and that the eleventh hour addition of four trial witnesses, two of whom are experts will prejudice its case. Mead Johnson argues that PBM is asking the Court to turn a good faith undertaking regarding discovery into a straight jacket that would prevent Mead Johnson from having a fair opportunity to present its case.

This Court issued a Scheduling and Pretrial Order on May 22, 2009. This required discovery to conclude and all depositions to be completed 41 days prior to trial, except by agreement of counsel. PBM was required to file a list of its witnesses 15 days prior to trial and Mead Johnson was required to file the same 10 days before trial. The parties were required to identify experts for their cases-in-chief at least 90 days prior to trial and experts for their defenses must have been identified at least 60 days before trial. Both parties were required to disclose any rebuttal experts 45 days prior to trial.

After a full review of the parties' briefs and holding a hearing on this matter, the Court GRANTS the Motion as to the testimony of Dr. Euler because such expert testimony would violate this Court's scheduling order. In all other respects, however, the Motion to Exclude Witnesses and to Quash Trial Subpoenas is DENIED.

## IV. MEAD JOHNSON'S MOTIONS IN LIMINE

### A. Motion in Limine to Exclude the Report and Expert Testimony of Dr. Barbara J. Petersen

Barbara J. Petersen, Ph.D. is a principal scientist at Exponent, Inc. and specializes in nutrition, microbiology, and biostatistics. PBM engaged Dr. Petersen to evaluate Mead

Johnson's claims of superiority of Enfamil over store bought infant formula, such as PBM's. In Petersen's opinion, the parties' infant formulas are nutritionally equivalent since they contain the same amount of nutrients, specifically additives called DHA and ARA. She also concludes that Enfamil Lipil is not supported by more clinical studies than PBM's products.

Mead Johnson advances two arguments against the admissibility of Dr. Petersen's testimony. First, Mead Johnson believes that Petersen's statements regarding the equivalency of the formulas are without foundation. Second, Mead Johnson further states that Petersen offers no scientifically acceptable basis for her opinion that PBM's formula is clinically proven to improve brain and eye development versus un-supplemented PBM formula. Mead Johnson begins by noting that PBM's products have not been subjected to any clinical testing and that PBM's claims that its formula has been tested is based, in fact, on the testing of Mead Johnson's products. Further, Mead Johnson maintains that PBM's basis for concluding that its products are equivalent to Mead Johnson's is itself based on flawed research.

While Mead Johnson attempts to point out weaknesses in Petersen's testimony, these flaws go to weight, not admissibility. Mead Johnson has not, and cannot, dispute that Petersen is an expert in the relevant field and that information about nutritional equivalency would be useful to the finder of fact. Mead Johnson's arguments primarily attack the conclusions reached, not the methods used. These alleged weaknesses may form the bases of arguments to the jury concerning the weight to give the testimony, but will not result in the testimony's exclusion. Mead Johnson's Motion in Limine as to Dr. Petersen is DENIED.

**B. Motion in Limine to Exclude the Report and Expert Testimony of Dr. Kenneth Wise**

Dr. Kenneth T. Wise is a principal at The Brattle Group, an economic consulting firm and holds a doctorate in economics from the Massachusetts Institute of Technology. PBM engaged Dr. Wise to analyze sales data and other relevant economic information to determine whether PBM lost sales due to Mead Johnson's advertising campaign. PBM wishes to introduce Dr. Wise's testimony at trial.

Mead Johnson now seeks to exclude his testimony for several reasons. First, it argues that Dr. Wise's regression analysis consists entirely of "invented variables" with no connection to any factors or events in the real world. Mead Johnson claims that four variables reflecting what are apparently short term "trends" do not reflect "causal forces" in the "real world" and that they are merely factors inserted to allow the past performance of PBM products to be easily modeled. Further, in Mead Johnson's view, Wise has discounted other factors from his model which do reflect "real world" events, such as changes in consumer tastes or the economy.

Second, Mead Johnson argues that by deliberately purging all "real world" explanatory variables from equation, Dr. Wise creates an "artificial world" in which variables tied to Mead Johnson's conduct appear to cause a downturn in plaintiff's market share. Specifically, it argues that variables introduced into the analysis to "account for" the change in sales seen after the mailer are "artificial variables" in a "results-driven analysis."

Third, Mead Johnson argues that Wise omits from his analysis critical factors that have nothing to do with the challenged communications and "everything" to do with changes in the market for baby formula, including the introduction of new products by third party competitors. Mead Johnson argues that Wise failed to account for the effects of increased ad

spending by Abbott labs and the introduction of its new Similac product, which Plaintiff recognized was a major source of competition.

Lastly, Mead Johnson argues that Dr. Wise's projections of future losses are entirely speculative. Mead Johnson initially casts doubt on whether future losses can be ascribed to a "single advertisement, which was last mailed out in April 2009." Mead Johnson next attacks Dr. Wise's use of the experience of Nestlé following reputation damaging disclosures regarding its products as a model for PBM's alleged reputational damages.

In light of standards laid out by the Federal Rules of Evidence and the applicable precedents, the Court finds that Dr. Wise's testimony is admissible. First, it is undisputed that Dr. Wise has extensive training and experience in the field of economics and in the specific practice of calculating lost profits in the context of economic torts. Thus, he is a qualified "expert" on the basis of "knowledge, skill, experience, training, or education." See Fed. R. Evid. 702. Second, his review of sales figures and other economic data that are combined to produce an estimate of the past and future profits lost by PBM will be helpful to the jury. See, e.g., Kopf v. Skyrm, 993 F.2d 374, 377 (4th Cir. 1993); Phoenix Renovation Corp. v. Rodriguez, 439 F. Supp. 2d 510, 523 (E.D. Va. 2006). Third, the data on which Dr. Wise based his report consists of reliable figures supplied by both parties and supplemented by publically available reports on the state of the infant formula market. Fourth, and finally, Dr. Wise's analysis consists of subjecting historical sales data to a regression analysis, the results of which are then used to calculate past and future losses. Past sales are a commonly used measure of damages, and a regression analysis is a widely recognized method for determining the relationship between various variables in a complex system. See Zenith

Electronics Copr. v. WH-TV Broadcasting Corp., 395 F.3d 416, 419 (7th Cir. 2005) (excluding the testimony of expert who had <u>not</u> conducted regression analysis).  While Mead Johnson may dispute the conclusions Dr. Wise made during the course of his analysis, this goes to the weight of his evidence rather than its admissibility.  Mead Johnson's Motion as to Dr. Wise is DENIED.

## C. Motion in Limine to Exclude the Report and Expert Testimony of Dr. Douglas E. Schoen

Douglas E. Schoen, Ph.D. is a principal at Douglas E. Schoen, LLC.  PBM engaged Dr. Schoen to create and administer a survey that could ascertain how much, if at all, Mead Johnson's 2008 Mailer impacted PBM's sales figures.  He was also asked to determine how, if at all, Mead Johnson's inclusion of a $5 coupon with the Mailer affect PBM's sales.  Dr. Schoen conducted his survey by presenting an online survey to a group of participants located by a third party.  Survey candidates were screened to ensure that they were (1) new parents or expecting a baby in the next six months, (2) were open to considering purchasing infant formula in general, (3) were not participating in the Women, Infants, and Children Nutrition Program, and (4) were or would be the primary or shared decision maker in choosing infant formula brands.  Initial purchase intent, or "Pre Purchase Intent" was determined by informing participants that "store brand infant formulas cost less than brand name infant formulas" and then asking how likely they would be to consider buying store brand infant formula.  Participants were all then shown a copy of the disputed advertisement, and in half of the cases, were also shown a copy of a $5 coupon.  Participants were then asked the same question again to determine their new "Post Purchase Intent."

Mead Johnson's opposition to admission can be summarized as wrong people, wrong questions, wrong expert. It advances five arguments in support of this position.

First, Mead Johnson argues that Dr. Schoen's evidence should be excluded because he did not sample the proper group of potential PBM customers. Mead Johnson maintains that because Dr. Schoen's sample size included types of individuals who never would have received the mailer and might not even be in the market for infant formula, his survey did not measure "the response of the proper universe of consumers."

Second, Mead Johnson argues that Dr. Schoen's survey results are "irretrievably contaminated by demand effect" and are therefore unreliable. It notes that demand effects arise from "characteristics of the experimental situation" that lead the subjects of experiments like the ones being conducted by Dr. Schoen to look for what the researcher considers to be the "right" response. Mead Johnson cites a number of cases where courts have ostensibly excluded expert testimony on this basis. It further suggests that the pre- and post-exposure questioning only amplifies these distortions, because survey takers will feel compelled to register <u>some</u> change in their preference. Because the first sentence of Dr. Schoen's survey includes a line comparing the price of store brand formula favorably to that of brand name formula, Mead Johnson argues that this bias is likely to be in PBM's favor.

Third, Mead Johnson argues that the reliability of Dr. Schoen's analysis cannot be determined because he did not include a control group in his survey. Mead Johnson cites a number of cases where this has been grounds for excluding expert testimony.

Fourth, Mead Johnson argues that Dr. Schoen is simply not qualified to serve as an expert in this case. Mead Johnson notes that Dr. Schoen has not served as an expert witness

in more than 20 years, has no formal training in advertising, and that the primary focus of his work is not consumer perceptions but political polling.

Fifth, and finally, Mead Johnson argues that Dr. Schoen's survey is not relevant to the issues in this case. It maintains that the central issue is what effect the disputed mailers would have had compared to mailers which were indisputably not misleading. To the extent that the survey only measures "reactions" in general, Mead Johnson maintains it is irrelevant. In support of this position, Mead Johnson cites the Fourth Circuit's decision in <u>Scotts Co. v. United Industry Corp.</u>, 315 F.3d 264, 277-79 (4th Cir. 2002), noting that in that case the court excluded evidence as to whether survey participants believed a weed killer "killed" mature crab grass when the real issue was whether consumers had been misled into believing that it "prevented" crab grass.

In light of these arguments and the applicable precedents, the Court declines to accept Mead Johnson's positions and holds that Dr. Schoen's testimony meets the test for admissibility. First, Dr. Schoen has extensive experience in measuring the impact specific messages would have on the perceptions of the recipient. Second, there can be little doubt that estimating the impact a message has on its recipients intention's involves specialized knowledge that would not be within the ordinary ken of a jury. Third, while the survey sample may not exactly match the audience that received the disputed advertisement, it is a sufficiently close approximation of the recipient pool. Accordingly, the Motion in Limine as to Dr. Schoen is DENIED.

**D. Motion in Limine to Exclude the Report and Expert Testimony of Joseph Ridgway**

Ridgway is the chairman and a principal of Bruno & Ridgway Research Associates, Inc. He has a degree in marketing and has designed and supervised many consumer surveys over more than two decades. Ridgway's report, entitled <u>Enfamil LIPIL Advertising Mailer Communication Test</u>, purports to measure "what ideas are being communicated to consumers by an Enfamil LIPIL advertising mailer in which specific reference are made about store brand infant formula." ("Ridgway Study"). The Ridgway Study is based on interviews conducted among four groups of consumers, two of which were exposed to the disputed advertisement and two of which were exposed to a "control mailer" containing ostensibly more accurate statements about Mead Johnson's products. Participants in the study were new and expectant mothers. After viewing either the disputed advertisement or a control mailer, participants dialed a toll free number and were questioned about the material.

Mead Johnson opposes the admission of the Ridgway Study and related testimony, arguing that Ridgway's work suffers from a number of fatal flaws. First, Mead Johnson argues that Ridgway chose the wrong survey participants. In support of this position, Mead Johnson initially charges that Ridgway erred in including within his pool of survey participants women who were not current or prospective purchasers of the product at issue and thus did not approximate the disputed advertisement's intended audience.

Second, Mead Johnson argues the Ridgway failed to use a proper control. Mead Johnson argues that Ridgway's "control" material contains wording comparing current and past formulations of Mead Johnson's products that leads respondents in a particular direction.

Third, Mead Johnson argues that Ridgway's question did not include proper filters and were leading and confusing. Mead Johnson characterizes Ridgway's questions as "closed ended" ones which led survey participants toward a particular result. Further, Mead Johnson faults Ridgway's failure to include questions which would identify survey participants who received no message or a non-misleading message from the disputed materials.

Fourth, Mead Johnson argues that Ridgway failed to adhere to standard protocols for well implemented litigation surveys. Mead Johnson charges that Ridgway cannot vouch for the reliability of his data as neither he, nor his firm, administered the underlying surveys. Mead Johnson further charges that Ridgway did not adequately document the instructions he provided to the company that conducted the surveys.

While Mead Johnson has pointed out numerous ways in which it would have conducted Ridgway's survey differently, its arguments do not demonstrate that the methods used were not of the type considered reliable by experts in Ridgway's field. The type of comparative controls used by Ridgway was one appropriate method to investigate how alleged "non-misleading" statements would effect recipients in comparison to the alleged misleading statements in the Mailer. Despite Mead Johnson's objections, Ridgway's use of open ended questions to filter out respondents with non-responses was a sufficient filter that permitted an acceptable evaluation of the close ended questions that followed the filter. Mead Johnson's arguments regarding whether an in-person versus a telephone survey should have been conducted, go to weight, not admissibility, as the facts of this case did not mandate one approach over another. Accordingly, this Court is convinced that Ridgway's

Survey is sufficiently reliable and relevant to be admissible in this matter. Mead Johnson's Motion in Limine as to Ridgway is DENIED.

## V. CONCLUSION

For the above stated reasons and per the Court's Order of October 27, 2009 (Docket No. 188), the Court resolves the parties' evidentiary motions as follows:

1. PBM's Motion in Limine to Exclude Testimony of Dr. Dhar is DENIED.

2. PBM's Motion in Limine to Exclude Testimony of Dr. Gering is GRANTED as to Gering's CDB damage calculations and DENIED as to Gering's Lanham Act damage calculations.

3. PBM's Motion in Limine to Exclude Evidence is GRANTED.

4. PBM's Motion to Exclude Witnesses and to Quash Trial Subpoenas is GRANTED as to Dr. Euler and DENIED in all other respects.

5. Mead Johnson's Motion in Limine to Exclude Testimony of Dr. Petersen is DENIED.

6. Mead Johnson's Motion in Limine to Exclude Testimony of Dr. Wise is DENIED.

7. Mead Johnson's Motion in Limine to Exclude Testimony of Dr. Schoen is DENIED.

8. Mead Johnson's Motion in Limine to Exclude Testimony of Mr. Ridgway is DENIED

Let the Clerk send a copy of this Memorandum to all counsel of record.

_____/s/_____
James R. Spencer
Chief United States District Judge

ENTERED this __4th__ day January 2010